# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

IN THE MATTER OF THE SEARCH OF INFORMATION )
ASSOCIATED WITH FACEBOOK USER ID "LESTHE )
BEST" (www.facebook.com/lesthe.best.5) THAT IS )
STORED AT PREMISES CONTROLLED BY FACEBOOK )
INC. )

Case No. 18-970M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

■ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 2113(a), 2113(d), 924(c)(1)(A)(ii), and 922(g)(1).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Daniel Gartland, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: December 21, 2018

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph_____, U.S. Magistrate Judge
*Printed Name and Title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID "LESTHE BEST"
(www.facebook.com/lesthe.best.5) THAT IS
STORED AT PREMISES CONTROLLED BY
FACEBOOK INC.

Case No. 18-970 M (NJ)

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Daniel Gartland, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for
information associated with a certain Facebook user ID that is stored at premises owned,
maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking
company headquartered in Menlo Park, California. The information to be searched is described
in the following paragraphs and in Attachment A. This affidavit is made in support of an
application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)
to require Facebook to disclose to the government records and other information in its
possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent for the Federal Bureau of Investigation (FBI), and have been
so employed since May 2018. Since October 2018, I have been assigned to the FBI's Milwaukee
Area Violent Crimes Task Force. This Task Force is a multi-jurisdictional law enforcement
entity charged with investigating violations of federal law, including bank robberies, commercial
robberies, and other violent crime matters, defined under Title 18 of the United States Code.

3. I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have assisted in criminal investigations, participating in surveillance, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 2113(a) (entering to commit a bank robbery), Title 18, United States Code, Section 2113(a) and (d) (armed bank robbery), Title 18, United States Code, Section 924(c)(1)(A)(ii) (use of a firearm during a crime of violence), and Title 18, United States Code, Sections 922(g)(1) (unlawful possession of a firearm by a prohibited person) have been committed by Quadir S. El Amin and Leslie Wilbert. There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes as described in Attachment B.

## PROBABLE CAUSE

6. On September 18, 2018, a federal grand jury in the Eastern District of Wisconsin returned an indictment against Quadir S. El Amin for violations of Title 18, United States Code, Section 2113(a) (entering to commit a bank robbery), Title 18, United States Code, Section 2113(a) and (d) (armed bank robbery), Title 18, United States Code, Section 924(c)(1)(A)(ii)

2

(use of a firearm during a crime of violence), and Title 18, United States Code, Sections 922(g)(1) and 924(e) (unlawful possession of a firearm by a prohibited person).

7.     On Friday, August 24, 2018 at approximately 1:22 p.m., a black male subject, later identified as Quadir S. El Amin, attempted to rob the Wells Fargo bank located at 6130 West National Avenue in West Allis, Wisconsin. The bank is a federally insured financial institution with its funds insured by the Federal Deposit Insurance Corporation. The subject walked through the vestibule, opened the lobby doors, and stepped inside of the bank while holding a black firearm in his right hand and carrying a black bag. As a bank customer walked towards the exit doors, the subject turned and fled.

8.     Officers of the West Allis Police Department were dispatched and responded to the bank. Witnesses described the subject as a male black, approximately 20 to 30 years old, approximately 6 feet tall with a skinny build, wearing a yellow traffic vest, dark clothing, and a mask. A witness observed a "white contractor type van with side windows" drive by twice after the subject fled.

9.     The bank's surveillance video shows a subject wearing a dark hooded sweatshirt, dark pants, a yellow traffic vest bearing the words "POBLOCKI PAVING" on the back, and black high-top shoes with red markings. The subject's hood is up, and the brim of his baseball cap is visible.

10.    Officers canvassed for the subject without success.

11.    Four days later on Tuesday, August 28, 2018 at approximately 9:49 a.m., a black male subject, later identified as Quadir S. El Amin, robbed the same Wells Fargo bank. Again, the subject was a black male with a thin build wearing a dark hooded sweatshirt, dark pants, a yellow traffic vest bearing the words "POBLOCKI PAVING" on the back, and black high-top

3

shoes with red markings. The subject approached a bank employee, pointed a small black firearm with a laser sight in his face, walked the employee over to the teller line, provided the employee the duffel bag, and told the employee to give the duffel bag to the teller. In response to verbal demands and threats, the teller filled the bag with money along with four bait bills and a GPS tracker. The subject took the bag and fled.

12.  Based on information from a parking enforcement employee and the GPS tracking device, officers initiated a pursuit of a white cargo van bearing Wisconsin license plate 709-YLG. Officers briefly lost sight of the white cargo van when it turned onto a side street. Officers observed El Amin running away from the van and gave chase. During that chase, El Amin tossed the duffel bag into some bushes near an apartment building before being taken into custody at approximately 9:57 a.m. At the time of his arrest, El Amin was wearing blue jeans, a black t-shirt, and black Nike Air Jordan high-top shoes with red markings.

13.  An officer recovered an LG cellphone from El Amin's left pants pocket, and a second officer recovered a small black pistol with a laser sight from his right pocket along with keys to the white cargo van. Officers also recovered the duffel bag, which contained the bank's money, bait bills, and GPS tracking device.

14.  A review of the Wisconsin Department of Transportation's Division of Motor Vehicles records revealed that the registered owner for vehicle registration 709-YLG is Nicholas D. Williams (DOB: 08/13/1981). On September 4, 2018, Detective Caleb Porter of the West Allis Police Department interviewed Williams. Williams stated that the white cargo van had previously been used for a transport business owned by Adam Hampton and that he last saw the white cargo van parked behind Hampton's residence.

4

15.     On September 6, 2018, Detective Porter then interviewed Adam Hampton, who stated that he was in the process of selling the white cargo van with Wisconsin license plate 709-YLG to Leslie Wilbert. Hampton allowed Wilbert to use the white cargo van, because he had paid a $500 down payment. However, Hampton would not transfer the title until Wilbert paid the balance. Hampton stated that Wilbert called him shortly after the robbery and stated that he had loaned the vehicle to another person to pick up supplies at Menard's, and the person had been pulled over while driving the van.

16.     Later that day, Detective Porter interviewed Wilbert, who stated that he loaned the white cargo van with Wisconsin license plate 709-YLG to Quadir S. El Amin on August 28, 2018—the day of the robbery at Wells Fargo Bank. According to Wilbert, El Amin came to Wilbert's house and asked to borrow the van to pick up supplies at Menard's for a side job. Wilbert agreed and told El Amin that he needed the van returned later that same day. Approximately thirty minutes after El Amin took the van, Wilbert received a call from El Amin from an unknown phone number. El Amin sounded distressed and advised that he had to jump out of the van. El Amin did not tell Wilbert where he was located. The call ended before Wilbert could obtain more information.

17.     Wilbert stated that he and El Amin met while incarcerated and stayed in contact after their release. Wilbert claimed that he last spoke with El Amin a few weeks before the day of the robbery. El Amin told Wilbert that he was losing his job and needed work. Wilbert stated that he did not want El Amin's vehicle at his house, so he drove the vehicle to El Amin's family the same day. After seeing a still photograph from the bank robbery, Wilbert stated that he previously worked for Poblocki Paving, but denied having a Poblocki Paving vest or providing the vest to El Amin. Wilbert provided a phone number of (414) 937-0832.

5

18.     A search warrant was issued to conduct a forensic analysis of El Amin's LG

cellphone. The phone number assigned to El Amin's LG cellphone is (414) 519-1365. That

forensic analysis shows multiple phone calls and text messages between (414) 519-1365 and

(414) 588-1797, shortly before and after the crimes on August 24, 2018 and August 28, 2018.

19.     Detective Porter reviewed publicly available information compiled by a consumer

credit reporting agency, which lists Leslie Wilbert as one of four people associated with phone

number (414) 588-1797.

20.     On August 24, 2018, El Amin placed phone calls from (414) 519-1365 to (414)

588-1797 at 11:57 a.m. and 12:03 p.m. He then exchanged the following communications with

that same number:

| 1790 | SMS Messages | Outgoing | | | 8/24/2018 12:13(UTC-5) | To: (414) 588-1797 | this day this time not good g [CB]4145191365 Source Extraction: Physical |
|------|--------------|----------|---|---|------------------------|--------------------|---------------------------------------------------------------------------|
| 1791 | SMS Messages | Incoming | | | 8/24/2018 12:13(UTC-5) | From: 4145881797 | Its empty [CB]4145881797 Source Extraction: Physical |
| 1792 | SMS Messages | Incoming | | | 8/24/2018 12:14(UTC-5) | From: 4145881797 | Its empty [CB]4145881797 Source Extraction: Physical |
| 1793 | SMS Messages | Outgoing | | | 8/24/2018 12:15(UTC-5) | To: (414) 588-1797 | we need to be over here earlier its plenty people out [CB]4145191365 Source Extraction: Physical |
| 1794 | Call Log | Incoming | | | 8/24/2018 12:17(UTC-5) | From: 4145881797 | 00:00:47 Source Extraction: Physical |

21.     Approximately an hour later at 1:22 p.m., El Amin ran into the Wells Fargo bank

while brandishing a firearm. Immediately afterwards, he placed multiple phone calls to the same

phone number at 1:22, 1:23, 1:24, 1:25, and 1:34 p.m.

22.     Later that evening, El Amin exchanged the following text messages with (414)

588-1797:

| 1852 | SMS Messages | Incoming | | | 8/24/2018 19:58(UTC-5) | From: 4145881797 | Bro is we on fasho [CB]4145881797 Source Extraction: Physical |
|------|--------------|----------|---|---|------------------------|------------------|----------------------------------------------------------------|
| 1853 | SMS Messages | Incoming | | | 8/24/2018 19:58(UTC-5) | From: 4145881797 | Bro is we on fasho [CB]4145881797 Source Extraction: Physical |

6

| 1855 | SMS Messages | Outgoing | | | 8/24/2018 19:59(UTC-5) | To: (414) 588-1797 | yes [CB]4145191365 Source Extraction: Physical |
|------|------|------|--|--|------|------|------|
| 1856 | SMS Messages | Incoming | | | 8/24/2018 20:00(UTC-5) | From: 4145881797 | Say no more [CB]4145881797 Source Extraction: Physical |
| 1857 | SMS Messages | Incoming | | | 8/24/2018 20:00(UTC-5) | From: 4145881797 | Say no more [CB]4145881797 Source Extraction: Physical |

| 1907 | SMS Messages | Outgoing | | | 8/24/2018 22:10(UTC-5) | To: (414) 588-1797 | my nigga u think we can have somebody go in there in the morning just to check trap [CB]4145191365 Source Extraction: Physical |
|------|------|------|--|--|------|------|------|
| 1908 | SMS Messages | Incoming | | | 8/24/2018 22:12(UTC-5) | From: 4145881797 | Yup [CB]4145881797 Source Extraction: Physical |
| 1909 | SMS Messages | Incoming | | | 8/24/2018 22:12(UTC-5) | From: 4145881797 | Yup [CB]4145881797 Source Extraction: Physical |

| 1912 | SMS Messages | Outgoing | | | 8/24/2018 22:18(UTC-5) | To: (414) 588-1797 | we gone boss [CB]4145191365 Source Extraction: Physical |
|------|------|------|--|--|------|------|------|
| 1913 | SMS Messages | Incoming | | | 8/24/2018 22:18(UTC-5) | From: 4145881797 | Ok [CB]4145881797 Source Extraction: Physical |
| 1914 | SMS Messages | Incoming | | | 8/24/2018 22:19(UTC-5) | From: 4145881797 | Ok [CB]4145881797 Source Extraction: Physical |
| 1915 | SMS Messages | Outgoing | | | 8/24/2018 22:19(UTC-5) | To: (414) 588-1797 | just to make sure they aint on nothing [CB]4145191365 Source Extraction: Physical |

23. El Amin exchanged multiple phone calls and text messages with (414) 588-1797 over the next few days, including the following on August 26, 2018:

| 2337 | SMS Messages | Outgoing | | | 8/26/2018 17:58(UTC-5) | To: (414) 588-1797 | u getting that car in the morning [CB]4145191365 Source Extraction: Physical |
|------|------|------|--|--|------|------|------|

| 2357 | SMS Messages | Incoming | | | 8/26/2018 18:39(UTC-5) | From: 4145881797 | We on [CB]4145881797 Source Extraction: Physical |
|------|------|------|--|--|------|------|------|
| 2358 | SMS Messages | Incoming | | | 8/26/2018 18:39(UTC-5) | From: 4145881797 | We on [CB]4145881797 Source Extraction: Physical |
| 2359 | SMS Messages | Outgoing | | | 8/26/2018 18:44(UTC-5) | To: (414) 588-1797 | ok [CB]4145191365 Source Extraction: Physical |

24. On August 28, 2018—the morning of the robbery, El Amin exchanged the following text messages with (414) 588-1797:

| 2545 | SMS Messages | Incoming | | | 8/28/2018 08:01(UTC-5) | From: 4145881797 | U up [CB]4145881797 Source Extraction: Physical |
|------|------|------|---|---|------|------|------|
| 2546 | SMS Messages | Incoming | | | 8/28/2018 08:01(UTC-5) | From: 4145881797 | U up [CB]4145881797 Source Extraction: Physical |
| 2547 | SMS Messages | Outgoing | | | 8/28/2018 08:22(UTC-5) | To: (414) 588-1797 | leaving out now [CB]4145191365 Source Extraction: Physical |
| 2548 | SMS Messages | Incoming | | | 8/28/2018 08:25(UTC-5) | From: 4145881797 | Ok [CB]4145881797 Source Extraction: Physical |
| 2549 | SMS Messages | Incoming | | | 8/28/2018 08:25(UTC-5) | From: 4145881797 | Ok [CB]4145881797 Source Extraction: Physical |

25. El Amin then received a 27-second phone call from the same number at 9:33 a.m. The bank robbery was committed at approximately 9:49 a.m. He then placed a minute-long phone call to the same number at 9:56 a.m. minutes before his arrest. That last phone call is consistent with surveillance video showing El Amin using a cellphone while fleeing on foot.

26. Detective Porter reviewed surveillance video from the Wells Fargo bank on August 24, 2018—the day of the attempted bank robbery. At approximately 12:08 p.m., a black male, matching Leslie Wilbert's description, entered the Wells Fargo bank and then exited at 12:15 p.m. That subject was wearing camouflage pants, a white t-shirt, sunglasses, and a tan checkered baseball cap with a red accent on the side.

27. Wells Fargo provided Detective Porter with information that Leslie Wilbert met with a banker at the Wells Fargo branch, located at 7600 West Hampton Avenue in Milwaukee, and inquired about opening a temporary debit card. A review of the surveillance images from that Wells Fargo branch showed the same black male, wearing camouflage pants, a white t-shirt, sunglasses, and a tan checkered baseball cap with a red accent on the side.

28. Detective Porter entered the phone number provided by Wilbert—(414) 937-0832—into www.facebook.com. The phone number was connected to the account "LesThe Best" (www.facebook.com/lesthe.best.5). That account had numerous photographs of Leslie Wilbert, including a photograph with Wilbert wearing a tan checkered baseball cap with a red

8

accent on the side. This baseball cap appears to be the same one worn by Wilbert inside of the Wells Fargo bank branches on August 24, 2018.

29.     Based on the text messages between El Amin and (414) 588-1797, Wilbert's presence inside of the two Wells Fargo branches within one hour of each other, and the attempted robbery of the Wells Fargo bank approximately one hour after Wilbert exited the bank, I believe that Wilbert acted in concert with El Amin to commit the attempted bank robbery on August 24, 2018. I also believe that Wilbert loaned El Amin the white cargo van bearing Wisconsin license plate 709-YLG on August 28, 2018 as a getaway vehicle for the armed bank robbery, because the registration was not listed to El Amin or Wilbert.

30.     On or about December 11, 2018, Special Agent Robert Rice of the FBI sent a preservation request to Facebook for the records relating to the "LesThe Best" account (www.facebook.com/lesthe.best.5). The account's privacy settings prevent others from viewing his Facebook Identification Number.

31.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

32.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

9

33. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user

10

and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

38. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

11

40.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

45.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may

12

communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

46.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts

13

and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

47.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

48.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

49.     Based on the forgoing, I request that the Court issue the proposed search warrant.

50.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

14

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

51.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

15

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook User ID "LesThe Best"
(www.facebook.com/lesthe.best.5), that is stored at premises owned, maintained, controlled, or
operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

## I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including the full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from August 1, 2018 to September 15, 2018.

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user from August 1, 2018 to September 15, 2018, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information from August 1, 2018 to September 15, 2018;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from August 1, 2018 to September 15, 2018;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any
        payments associated with the service (including any credit card or bank account
        number);

(p)     All privacy settings and other account settings, including privacy settings for
        individual Facebook posts and activities, and all records showing which Facebook
        users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person
        regarding the user or the user's Facebook account, including contacts with support
        services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days
of service of this warrant.

3

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 2113(a) (entering to commit a bank robbery), Title 18, United States Code, Section 2113(a) and (d) (armed bank robbery), Title 18, United States Code, Section 924(c)(1)(A)(ii) (use of a firearm during a crime of violence), and Title 18, United States Code, Sections 922(g)(1) and 924(e) (unlawful possession of a firearm by a prohibited person) committed by Quadir S. El Amin and Leslie Wilbert in August 2018, including, for each user ID identified on Attachment A, information pertaining to the following matters:

- (a) A robbery or attempted robbery of a bank or banks committed by Quadir S. El Amin and/or Leslie Wilbert;
- (b) The possession or use of a firearm by Quadir S. El Amin and/or Leslie Wilbert;
- (c) The possession, use, or ownership of a white cargo van bearing Wisconsin license plate 709-YLG;
- (d) The presence of Quadir S. El Amin and/or Leslie Wilbert at the Wells Fargo bank;
- (e) Communications between Quadir S. El Amin and Leslie Wilbert;
- (f) Evidence of any scheme, plan, or agreement between Quadir S. El Amin and Leslie Wilbert;
- (g) Evidence of a relationship between Quadir S. El Amin and Leslie Wilbert;
- (h) Preparatory steps taken in furtherance of the scheme;
- (i) The proceeds of any robbery of a bank or banks;

4

(j) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(k) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(l) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).